**RECEIVED**
IN LAKE CHARLES, LA.

**MAY 11 2011**

TONY R. MOORE, CLERK
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION** | : | **DOCKET NO. 2:09 CV477** |
| **VS.** | : | **JUDGE MINALDI** |
| **MIKE HOOKS, INC.** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by the defendant, Mike

Hooks, Inc. ("Hooks") [Doc. 22]. The plaintiff, the Equal Employment Opportunity Commission

("EEOC"), filed an Opposition [Doc. 30], and Hooks filed a Reply [Doc. 33].

### BACKGROUND

This lawsuit was filed by the EEOC, on behalf of Daniel Johnson, for claims arising

under Title VII of the 1964 Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*

The EEOC alleges that Hooks subjected Mr. Johnson, an African-American, to racial

discrimination, a hostile work environment, and retaliation that culminated in his discharge.[1]

Hooks is a dredging company that owns the dredge MISSOURI H. On March 3, 2007,

Hooks employed Mr. Johnson as an oiler on that vessel. Upon hiring Mr. Johnson, Hooks

explained the company's various employment policies with Mr. Johnson, including its policy

prohibiting discrimination and policy prohibiting violence and threats of violence (hereinafter,

"discrimination policy" and "violence policy," respectively).[2]

---

[1] Compl. [Doc. 1].

[2] *See* Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 25-27 [Doc. 30-3].

1

The Hooks representative stated that the company had zero-tolerance for a violation of the discrimination policy and violence policy. Indeed, the violence policy itself clearly explains that "all workers . . . will be subject to severe discipline for any act of violence or threat that they commit." The violence policy forbids "physical conduct which would cause a reasonable person to fear bodily harm." Employees who violate the policy are subject to immediate reprimand.[3]

The policy further encourages those who feel that they have been the victim of violence or threats of violence to report the harassment to their supervisor immediately. If the employee is dissatisfied with the resolution of the complaint, the policy instructs the employee to call the Personnel Director at Hooks. The policy further explains that "[e]mployees must keep the allegation(s), investigation, and the corrective action confidential."[4] Mr. Johnson signed the policy after the Hooks representative went through the policy with him.

Initially, Mr. Johnson was hired for a two-week-on/one-week-off period; meaning, he would work two weeks on the MISSOURI H, typically for designated twelve-hour shifts, and once this two-week period ended, Mr. Johnson would have one week off of work. However, at the time Mr. Johnson was hired, the MISSOURI H was under-staffed. Accordingly, Mr. Johnson's first shift was allegedly scheduled to last five weeks.[5]

On the dredge, Mr. Johnson was assigned to a living quarters, which included bunks and a communal restroom, with another oiler, Kyle Hendrickson. Within the first few days on board

---

[3] *See id.*; Def.'s Reply, Ex. 1, Dep. of Jimmie Monceaux, Threats of Violence Policy [Doc. 33-1].

[4] *Id.*

[5] *See* Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, at 28-29 [Doc. 30-3].

the dredge, Mr. Johnson and Mr. Hendrickson were involved in a confrontation. The facts surrounding the confrontation are in dispute.[6]

Mr. Johnson alleges that on March 6 he knocked on the restroom door to see if it was occupied. Mr. Hendrickson purportedly responded with "what the fuck do you think"? According to Mr. Johnson, he politely replied by asking "how it was necessary for him to respond that way." Mr. Johnson then waited outside of the living quarters while Mr. Hendrickson used the restroom.[7]

Five minutes later, Mr. Johnson re-entered the living quarters to confront Mr. Hendrickson about his language. Mr. Johnson then reiterated to Mr. Hendrickson that saying "what the fuck do you think" was unnecessary. According to Mr. Johnson, Mr. Hendrickson jumped out his bed and said, "nigger, get out of my face." He then allegedly pushed Mr. Johnson, who fell back a couple of feet.[8]

Somehow after the push, Mr. Hendrickson's hands were still on Mr. Johnson. Mr. Johnson purportedly responded by calmly removing Mr. Hendrickson's hands and saying "we're not going to have an altercation. We're going to go talk – we'll talk to [the engineer on board] about what happened."[9] Though he currently denies ever pushing Mr. Hendrickson, Mr. Johnson has admitted to pushing Mr. Hendrickson during this altercation.[10]

---

[6] *See generally* Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson & Ex. 2, Dep. of Jimmie Monceaux [Doc. 30-3].

[7] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 39 [Doc. 30-3].

[8] *Id.* at 40-41.

[9] *Id.* at 42-43.

[10] *Id.* at 94; Pl.'s Opp'n, Ex. 5, Charge of Discrimination ("[Mr. Hendrickson] got up from his bed and got in my face and said, 'Nigger, get out of my face,' then he pushed me. *I pushed him ([Mr. Hendrickson]) back.*") (emphasis added) [Doc. 30-4].

Next, Mr. Johnson and Mr. Hendrickson immediately reported the incident to their supervisor, Juan Lopez, the assistant chief engineer on the dredge. During this conversation, Mr. Johnson claims that Mr. Hendrickson initially denied calling Mr. Johnson a "nigger," but then eventually admitted to it. Mr. Lopez allegedly asked Mr. Hendrickson why he would say something like that. Mr. Hendrickson then purportedly justified his outburst, explaining that he uses the word "nigger" with his "black friends and they don't have a problem with it." Mr. Johnson explained that they were not friends, and that he did not appreciate that language.[11]

Mr. Lopez asked the two whether they could resolve the situation, and both parties agreed. Mr. Lopez required Mr. Hendrickson to apologize for his conduct, which he allegedly did. Mr. Johnson apparently accepted his apology. The two shook hands, and Mr. Lopez reprimanded Mr. Hendrickson, warning him that "it was not going to happen again."[12]

Arrangements were made to immediately separate the two men. Both men were given their own living quarters: Mr. Johnson was moved to another room typically occupied by an engineer while Mr. Hendrickson remained in the original room.[13]

Mr. Johnson claims he only encountered Mr. Hendrickson on approximately three occasions after the incident. As Mr. Hendrickson would pass Mr. Johnson in the hallway, "he would make comments that [Mr. Johnson] couldn't quite make out." Inexplicably, Mr. Johnson claims that on one of those occasions, Mr. Hendrickson might have muttered a statement like "Motherfucker, you motherfucker" under his breath as they passed. Mr. Johnson responded by

---

[11] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 52-55 [Doc. 30-3].

[12] *Id.* at 55.

[13] *Id.* at 56.

saying, "excuse me, did you say something"? And, Mr. Hendrickson would just ignore him and walk off.[14] There were no reports of additional harassment on board the dredge.

A short time after the initial altercation, Mr. Lopez left the MISSOURI H on leave, and he was replaced by Jesse Boone, who would act as the dredge's engineer. Before Mr. Boone left for the dredge, Mr. Lopez informed him of the incident. He did not say that Mr. Hendrickson had used the word "nigger," although he did explain that it might have been said. Mr. Lopez then mentioned that there was pushing and shoving between the two – Mr. Hendrickson and Mr. Johnson – but they had agreed to work things out.[15]

When Mr. Boone returned to the dredge, he had brief conversations with Mr. Hendrickson and Mr. Johnson about the incident, asking them, in turn, whether they were going to get along. Both parties apparently agreed. Mr. Johnson also indicated that Mr. Boone noted that he was a good employee, and that Mr. Boone was happy to have him on the dredge.[16]

Later, Mr. Boone noticed tensions were running high on the dredge. Specifically, he claims that he was confronted by a kitchen staff employee, who asked him whether he was going to take care of the incident between Mr. Hendrickson and Mr. Johnson. Realizing that the two were either not getting along or broadcasting their complaints to the employees on the dredge, and that the dredge staff was actively talking about the incident, Mr. Boone requested a meeting

---

[14] *Id.* at 58-59 ("As we pass each other, he mumbles comments under his breath that I couldn't quite make out."). On another occasion, this time during a meal in the dredge's dining area, Mr. Hendrickson purportedly called Mr. Johnson "ugly." However, Mr. Johnson admits that the remark was made in a joking manner, and Mr. Hendrickson had also called another oiler on the dredge "ugly." Mr. Johnson nevertheless expressed in his deposition that he did not appreciate the comment, though he never reported it to Hooks personnel. And, there is no indication that Hooks' personnel knew or reasonably should have known of this alleged incident. *Id.* at 66-67.

[15] Pl.'s Opp'n, Ex. 3, Dep. of Jesse Boone, 14 [Doc. 30-3].

[16] *Id.* at 17-19; Pl.s' Opp'n, Ex. 3, Dep. of Daniel Johnson, 73 [Doc. 30-3].

with Mr. Johnson, Mr. Hendrickson, and the Captain of the MISSOURI H, Jimmy Monceaux.[17] Mr. Johnson, however, claims that he called for the meeting shortly after Mr. Boone spoke with him about the incident. Regardless, within days of the altercation, the parties met again.[18]

At the meeting, Mr. Johnson and Mr. Hendrickson argued over whether Mr. Hendrickson used the word "nigger." Both Captain Monceaux and Mr. Boone attest that Mr. Hendrickson denied calling Mr. Johnson a "nigger." Mr. Johnson and Mr. Hendrickson continued to argue about whether "nigger" had been said and whether Mr. Hendrickson had admitted to Mr. Lopez that he said "nigger." This continued until it allegedly became so loud that Captain Monceaux told them to "shut it down, quit yelling and bickering." He also said that they needed to shake hands.[19]

Mr. Johnson and Mr. Hendrickson calmed down and shook hands. The meeting resumed. Eventually, they both admitted to pushing each other, though neither agreed on who pushed

---

[17] *Id.* at 47-48 ("Q. And why did you ask for the meeting to take place or call the meeting? A. Because I heard everybody on the dredge talking about what was going on. And I heard that Mr. Johnson wasn't happy. After he said he was happy, I heard he wasn't happy."). Apparently, both Mr. Hendrickson and Mr. Johnson were actively discussing the incident with other employees on the dredge, with Mr. Hendrickson instigating much of the conversation. Def.'s Mot. for Summ. J., Ex. 1, Dep. of Daniel Johnson, 69 [Doc. 22-3]. However, there is no indication that Captain Monceaux or Mr. Boone knew who initiated the discussions with other dredge employees.

[18] What can be gleaned from the summary judgment evidence is that there were two meetings: one where Mr. Johnson reported the incident after Hooks took immediate remedial action, but this time he addressed his complaint to Captain Monceaux and Mr. Boone (even though he already spoke to Mr. Boone about the incident in private), and another where apparently Mr. Johnson insisted on Mr. Hendrickson's termination or the two men were summarily terminated. It is impossible to distinguish the two meetings in terms of content based on the summary judgment record. The deposition testimony of Mr. Johnson significantly differs from Mr. Monceaux and Mr. Boone's testimony, at least in terms of timing, which is patently unclear. Thus, in viewing the facts in a light most favorable to the EEOC, this Court will construe both meetings as taking place simultaneously. This Court, however, notes that the testimony generally indicates that Mr. Johnson agreed to a resolution of his complaint with Mr. Hendrickson at the some point, but requested another meeting to restate his initial grievance.

[19] Pl.'s Opp'n, Ex. 2, Dep. of Jimmie Monceaux, 54-55 [Doc. 30-3].

whom first. Mr. Johnson claimed that he was provoked and acted only in self-defense. Mr. Johnson claims that he informed Captain Monceaux and Mr. Boone that Mr. Hendrickson had called him a "mother fucker" after the incident, but both Captain Monceaux and Mr. Boone deny that Mr. Johnson made this statement.[20] Mr. Johnson claims that this meeting largely occurred because he wanted to restate his initial complaint to the Captain, although Mr. Johnson does not claim that any additional racially motivated confrontations occurred between the two individuals. This contention is inconsistent with his earlier testimony, in which he indicated that he asked Mr. Boone "if there could be a meeting between" the two men, Mr. Hendrickson and Mr. Johnson.[21] Nonetheless, in his deposition testimony, Mr. Johnson asserts that these supervisors were eventually "insensitive" towards him at this meeting.

Ultimately, Mr. Johnson did not feel that a simple "write-up" would ameliorate the situation; he wanted Hooks to fire Mr. Hendrickson for calling him a "nigger." He also expressed to Captain Monceaux and Mr. Boone that when he was hired, Hooks explained to him that it had zero tolerance for Mr. Hendrickson's behavior. According to Mr. Johnson, zero tolerance meant that a person who violates the policy is immediately terminated.[22]

Mr. Johnson continued to insist that Mr. Hendrickson should be fired. He further threatened Hooks, warning Mr. Boone and Captain Monceaux that if they did not fire Mr.

---

[20] *Id.* at 59; Ex. 3, Dep. of Jesse Boone, 60 [Doc. 30-3]. Captain Monceaux indicated that Mr. Hendrickson used the words "mother fucker" during the initial altercation. *Id.*

[21] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 75 [Doc. 30-3].

[22] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 91 [Doc. 30-3].

Hendrickson, it could lead to other issues, that what had happened could get out beyond the company, and it could turn into a media nightmare.[23]

Mr. Boone and Captain Monceaux initially balked at Mr. Johnson's demand. In relevant part, they responded in four ways. First, after purportedly hearing the rage in Mr. Johnson's voice, Captain Monceaux informed Mr. Johnson that he was stirring up the dispute, and the Captain asked him to drop the issue in the hope that the two could build a working relationship. Next, Mr. Boone asked what Mr. Johnson would gain[24] from Hooks firing Mr. Hendrickson, to which he responded that he would be happy to know Mr. Hendrickson was fired. Mr. Johnson admitted that this feeling stemmed from taking offense to Mr. Hendrickson's alleged remark, and his subjective belief that zero tolerance mandated termination.[25]

Then, Mr. Boone explained that they would need some evidence, something other than "one man's word against the other," before Hooks could fire Mr. Hendrickson under the discrimination policy, as Mr. Hendrickson denied calling Mr. Johnson a "nigger." Finally, Captain Monceaux warned Mr. Johnson that his insistence on termination for a violation of a Hooks zero-tolerance policy could result in his own termination: it would mean that both parties

---

[23] *Id.* at 92. Mr. Johnson also secretly recorded the meeting. *Id.* at 87. That recording, however, has not entered the record.

[24] *Id.* at 91-92; Ex. 2, Dep. of Jimmie Monceaux, 62-63 ("The rage was in his voice whenever we had the first meeting with him. . . ."); Ex. 3, Dep. of Jesse Boone, 70-71 [Doc. 30-3]. Captain Monceaux asked Mr. Johnson "how was firing Mr. Hendrickson going to make him happy," and Mr. Johnson responded that it would make him feel good if he knew that Mr. Hendrickson did not have a job anymore. *Id.*

[25] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 91-92 ("I also expressed to them that my understanding of zero tolerance was the first time you do it, the first time you're gone. And Captain and [Mr. Boone] continued to ask me, 'Well, would you be happy if he got fired? What would you get out of the situation'? And I expressed to them that I felt he should be fired but I reiterated to them, "your company policy is, from what it was expressed to me . . . , that you guys have zero tolerance.") [Doc. 30-3].

– Mr. Johnson and Mr. Hendrickson – were subject to termination under the violence policy. In other words, he would have to enforce Hooks' zero tolerance policies equally. When Mr. Johnson asked "why," Captain Monceaux indicated that both of Mr. Hendrickson and Mr. Johnson were fighting. Again, Mr. Johnson explained that he only fought back in self-defense. He further insisted that Mr. Hendrickson should be fired. [26]

Realizing that the dispute could not be resolved between the two men, Captain Monceaux informed the parties that he would call the Hooks office to determine the appropriate course of action. Captain Monceaux then called Jack Cseitzinger, Hooks' Safety Director.[27] At the time, Mr. Cseitzinger believed the situation was settled. He initially viewed the incident as largely a personality conflict that erupted in violence. He incidentally requested that the situation be handled at the lowest level possible.[28]

However, when the vessel management informed Mr. Cseitzinger of a continuing problem, Mr. Cseitzinger described the issue as, "workplace violence that was perpetuating further." Captain Monceaux and Mr. Cseitzinger agreed that the proper course of action was to terminate the employment of Mr. Johnson and Mr. Hendrickson for violation of Hooks zero-tolerance violence policy.[29]

On March 12, 2007, Captain Monceaux informed Mr. Johnson and Mr. Hendrickson that their employment with Hooks had been terminated. Mr. Boone prepared the termination report,

[26] Pl.'s Opp'n, Ex. 3, Dep. of Jesse Boone, 70-71; Ex. 1, Dep. of Daniel Johnson, 94 [Doc. 30-3].

[27] This Court notes that Hooks' safety director, not EEO officer, was called-upon to assist with the determination of whether the two men should be fired.

[28] See Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 94 [Doc. 30-3]; see Def.'s Mot. for Summ. J., Dep. of Jack Cseitzinger, 12-13 [Doc. 22-3].

[29] Def.'s Mot. for Summ. J., Dep. of Jack Cseitzinger, 12-13 [Doc. 22-3].

which indicated that both men would be considered for reemployment, though neither party was informed that they would be considered for rehire when they were fired. Hooks maintains that its decision to fire Mr. Johnson and Mr. Hendrickson had nothing to do with Mr. Johnson's race or his opposition to alleged racial discrimination.[30]

Several weeks after being fired, Mr. Hendrickson purportedly called Hooks, requesting to be rehired. Hooks rehired him, but he was only employed for a brief time. Mr. Johnson, however, never sought reemployment, as he claims no knowledge that he could be rehired.[31] When Mr. Johnson discovered that Mr. Hendrickson had been hired eighteen days after being fired, he filed a complaint with the EEOC. This lawsuit ensued.

Hooks has filed a motion for summary judgment, arguing that the EEOC does not have sufficient evidence to present a material issue of fact for trial. Hooks asserts that there is no evidence of discrimination, and likewise that there is insufficient evidence for a reasonable jury to infer that Hooks subjected Mr. Johnson to a hostile work environment. Finally, Hooks sets forth the non-discriminatory reason for terminating Mr. Johnson and argues that the EEOC cannot rebut this reason. In other words, Hooks claims that the EEOC will be unable to provide substantial evidence to indicate that Hooks was motivated to fire Mr. Johnson for his purported protected opposition activity.[32]

The EEOC responds by claiming that "genuine issues of material fact exist as to each element of the Commission's prima facie case for" the claims of discrimination, hostile work environment, and retaliation. Further, the EEOC asserts that the summary judgment evidence

---

[30] See Def.'s Mot. for Summ. J. [Doc. 22]; see also Def.'s Reply, Affs. of Jimmie Monceaux and Jesse Boone [Doc. 33-1].

[31] See Def.'s Reply [Doc. 33-1].

[32] See Def.'s Mem. in Supp. of Mot. for Summ. J. [Doc. 22]

"raises genuine issues of material fact as to [Hooks'] purported reason for its actions regarding" Mr. Johnson's termination.[33]

While Title VII lawsuits are generally subject to shifting burdens, the burden of persuasion ultimately rests with the plaintiff. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). That is, once the defendant has come forward with evidence of a non-discriminatory reason for its employment decision, the plaintiff's prima facie case ceases to exist, and the burden of persuasion rests with the plaintiff. *Walton v. Bisco Inds., Inc.*, 119 F.3d 368, 370 (5th Cir. 1997) ("First, the plaintiff must establish a prima facie case of discrimination; second, if he is so successful, the defendant must articulate some legitimate, nondiscriminatory reason for the challenged employment action; and third, if the defendant is so successful, the inference of discrimination raised by the prima facie case disappears, and the plaintiff then must prove, by a preponderance of the evidence, both that the defendant's articulated reason is false and that the defendant intentionally discriminated. If the defendant has successfully rebutted the presumption created by the prima facie case-that plaintiff's rejection was racially motivated-the factual inquiry proceeds to a new level of specificity.") (internal citations omitted) (citing *Hicks*, 509 U.S. at 510-11).

## OBJECTIONS TO THE SUMMARY JUDGMENT EVIDENCE

The EEOC also objects to a significant portion of Hooks' summary judgment evidence. A party may object to the material cited by the opposing party on the basis that the material cited "cannot be," in contrast with "is not," presented in a form that "*would* be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). Accordingly, the evidence need not be

---

[33] *See* Pl.'s Opp'n 6 [Doc. 30].

presented in a form that would be admissible at trial; rather, the evidence must merely be capable of being converted into admissible evidence at trial. *Gleken v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365 (D.C. Cir. 2000). In other words, an admissible form must merely be "anticipated." *See* Fed. R. Civ. P. 56, 2009 Amendments, Subdivision (c).

Furthermore, Rule 56 sets out requirements for the admissibility of affidavits. When affidavits are used to support a motion for summary judgment, they "must be made on personal knowledge, set out facts that *would* be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Here, the EEOC objects to:

(1) The Affidavits of Jimmie Monceaux and Jesse Boone in their entirety on the basis that they fail to comply with Rule 56 of the Federal Rules of Civil Procedure, as they, in part, purportedly do not sufficiently show the affiants personal knowledge of the matters asserted;

(2) Paragraphs V and VII of the Affidavits of Jimmie Monceaux and Jesse Boone on the basis that they contain inadmissible hearsay;

(3) The unnumbered Exhibits attached to the Affidavit of Jimmie Monceaux because they have not been authenticated and Hooks has not established the foundation for their admission into evidence;

(4) The unnumbered Exhibits attached to the Affidavit of Jesse Boone because they have not been authenticated and Hooks has not established the foundation for their admission.

The EEOC argues that the affidavits are generally unreliable, pointing out that a significant portion of the affidavits were cut and pasted from each other and that the affidavits are written in the third-person, as opposed to first-person, perspective. In Reply, Hooks has amended its affidavits to set forth a first-person perspective, though the affidavits largely remain unchanged.

This Court overrules the EEOC's objections, finding that all of Hooks' summary judgment evidence admissible. The affidavits, in their entirety, are based on personal knowledge, as they explicitly state so in the first paragraph. They also contain admissible evidence, and show that the affiant is competent to testify on the matters asserted. While some of the paragraphs appear identical, other paragraphs are not. Rule 56 does not mandate that affidavits may not appear identical, and, just because some of the paragraphs are identical does not discredit the affidavits in such a way to render them inadmissible.

In addition, paragraphs V and VII of those affidavits do not contain inadmissible hearsay evidence. The statements made by Mr. Johnson referenced in paragraph V fall under Rule 801(d)(2)'s hearsay exception if made at trial, as it is an admission by a party opponent that is offered against that party. The statements made by Captain Monceaux and Mr. Boone in paragraph V and VII are generally not hearsay, as they are not intended to prove the truth of the matter asserted. For instance, the statements are not offered to indicate that Mr. Johnson actually violated the threats of violence policy. And, they are only offered to prove that Hooks in good faith fired Mr. Johnson for reasons other than race or retaliation, which is not hearsay. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 366-67 (6th Cir. 1998) (finding statements to management by employees supervised by age-discrimination plaintiff that he was abusive or unstable were not hearsay because those statements were offered to show reasons other than age for the plaintiff's demotion and termination); *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321 (11th Cir. 1982) (supervisor's records regarding the plaintiff's conduct were not hearsay when not offered to prove the conduct but to show the employer's reason for the employee's termination were not based on age). To the extent that they do contain hearsay evidence, they are used to indicate the state of mind of the affiant, which is directly at issue in this case. This falls under Rule 803(3)'s

hearsay exception. *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1249-50 (6th Cir. 1995) (finding racist comments by management personnel admissible under Rule 803(3)).

The unnumbered exhibits, moreover, would be properly authenticated at trial, and they fall within the business records exception to the hearsay rule, as at trial they could readily be authenticated by a member of Hooks' staff who is qualified to provide a foundation for those exhibits.[34] *See* Fed. R. Evid. 803(6); *See United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984) ("The witness need only have knowledge of the procedures under which the records were created."). For instance, Mr. Boone noted that they were the termination reports he drew up, and their foundation is based on an oath, attesting to personal knowledge, on an issue relevant to Mr. Johnson's claim. *See* Fed. R. Evid. 901. Likewise, it is "anticipated" that the copies of the violence policy would be admissible a trial, as Hooks maintains the documents in its employment files, deponents, including the affiants, with knowledge of the procedures by which the records were created can readily lay a foundation and authenticate that evidence. Accordingly, Hooks' summary judgment evidence is admissible.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial.

---

[34] The unnumbered exhibits are also attached to the deposition of Deborah Broussard, who can readily establish a foundation for that evidence. *See* Def.'s Reply, Dep. of Deborah Broussard [Doc. 33-1].

*Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). If the dispositive issue is one that the nonmoving party bears the burden of proof at trial, the moving party may satisfy its burden by merely identifying evidence in the record that negates an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex,* 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, summary judgment is warranted when the record as a whole "could not lead a rational finder of fact to find for the non-moving party." *Id.*

## ANALYSIS

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin" that is pervasive enough to (1) alter the conditions of employment or (2) create a hostile work environment. 42 U.S.C. § 2000e–2(a). Title VII also prohibits retaliation against an employee who has opposed an employer's discriminatory activity (commonly referred to as the "opposition clause") or has "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation (commonly referred to as the "participation clause"). *Id.* § 2000e–3(a). The retaliation provision affords a much broader ambit of protection than the general discrimination provision. *See Pettway v. Am. Cast Iron Pipe Co.*, 411 F.2d 998, 1006 n. 18 (5th Cir. 1969) (holding that those who testify in Title VII proceedings

are endowed with "exceptionally broad protection"). The EEOC alleges that Hooks fired Mr. Johnson in retaliation for engaging in protected, opposition activity.[35]

### (1) Discriminatory Termination

To establish a prima facie case of racial discrimination, the plaintiff must establish four elements: that the employee "(1) is a member of a protected class; (2) was qualified for the employment position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, . . . that other similarly situated employees were treated more favorably." *Thomas v. Louisiana Dep't of Social Servs.*, No. 10-30607, 2010 WL 5421092, at *4 (5th Cir. Dec. 30, 2010) (quoting *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004)).

The parties do not dispute that elements one through three are met; at issue is the fourth element. Here, the EEOC's prima facie case of racial discrimination fails because they have not offered any evidence of discrimination.[36] When Mr. Hendrickson was re-hired, he did not replace Mr. Johnson. Mr. Hendrickson merely filled the shoes he once occupied. Mr. Johnson never sought reemployment. *See McCullough v. Houston County Tx*, No. 07-40949, 2008 WL 4613697, at *5 (5th Cir. 2008) ("To establish a prima facie case of discrimination where the

---

[35] As discussed below, the EEOC's claims under Title VII are governed by the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Generally, under the *McDonnell Douglas* framework, the plaintiff bears "the initial burden . . . of establishing a prima facie case of racial discrimination." *Id.* Once the plaintiff meets this initial burden, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for [its conduct]." *Id.* This burden on the employer is one of production, not persuasion, involving no credibility assessments. See *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). If the employer meets this burden, then the plaintiff must "demonstrate by competent evidence that the presumptively valid reasons for [its action] were in fact a cover-up for a racially discriminatory decision." *Id.* at 805.

[36] Of note, the EEOC appears to have abandoned its discriminatory termination claim, as they have not addressed it in their Opposition to Hooks' Motion for Summary Judgment. Nevertheless, this Court takes up the issue. *See* Pl.'s Opp'n [Doc. 30].

16

alleged adverse employment action is failure to rehire, the plaintiff must have actually sought the position she is alleged to have been denied).

Likewise, The EEOC has not come forward with any evidence to demonstrate that Mr. Johnson was replaced. Nor has the EEOC presented evidence that other, similarly situated employees were treated more favorably. The EEOC admits that the Hooks' supervisors had never encountered a situation analogous to the situation presented here. Additionally, Hooks chose a course of action by which the two employees were treated equally. Thus, Hooks is entitled to summary judgment on the EEOC's discrimination claim.

### (2) Hostile Work Environment

A prima facie case of racial discrimination alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcomed harassment; (3) the harassment complained of was based on race; (4) the harassment complained of was so severe or pervasive that it affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v. Petroleos de Venezuella, SA*, 266 F.3d 343, 353 (5th Cir. 2001) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999)).

The EEOC asserts that a genuine issue of material fact exists on its hostile work environment claim. The EEOC contends that Mr. Hendrickson's actions were so objectively and subjectively offensive to essentially satisfy its prima facie case.

A preliminary problem with the hostile work environment claim is that the EEOC simply assumes that Mr. Hendrickson's behavior is imputable to Hooks. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788-89 (1998) (indicating that courts and litigators alike often improperly focus on the work environment and ignore whether the employer is liable for the abusive employee's actions when determining whether an *employer* is liable for a hostile work

17

environment, and holding that both issues are relevant). The EEOC alleges that *Hooks* maintained a hostile work environment through the actions of Mr. Hendrickson. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 71 (1986) (explaining that common law agency principles govern an employer's liability for acts of co-workers in a discrimination claim). What is dubious about this evidence is its timing: the EEOC asserts that Mr. Hendrickson – Mr. Johnson's co-worker – created a hostile work environment through an isolated incident that Hooks had no reason to believe was going to occur or had occurred until Mr. Johnson and Mr. Hendrickson reported the incident to a supervisor. In trying to impute this incident to Hooks, the EEOC erroneously assumes that Hooks is vicariously liable for Mr. Hendrickson's conduct.

An employer is vicariously liable for its employee's actions in two types of situations: (1) when there is a tangible employment action or (2) when the harassing employee is a proxy for the employer. *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 384 (5th Cir. 2003). Since Mr. Hendrickson did not have the authority to take corrective action on behalf of Hooks, only the latter situation is applicable here.

When an employee (1) is not a supervisor, (2) lacks the authority to take significant action on part of the employer, or (3) has no authority to affect the terms and conditions of a co-worker's employment, he is generally not a proxy of the employer. *See Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000). In *Johnson*, the Seventh Circuit found that the harasser, the Chief of Police at a VA hospital, was not a proxy for the VA because, despite some supervisory authority, "he had no less than two supervisors . . . within the hospital and no doubt others within the VA's bureaucracy. As such he was not a high-level manager whose actions 'spoke' for the VA." *Id.* The court further noted that the harasser had no authority to change the terms and conditions of the employee's employment, and the employee worked for several supervisors. *Id.*

In this case, Mr. Hendrickson's actions are not imputable to Hooks. Like the limited authority of the harasser in *Johnson*, Mr. Hendrickson is not in a role to "speak" for Hooks, and he had no authority to change the terms and conditions of Mr. Johnson's employment. In fact, he had an inferior role to that of the harasser in *Johnson*, who arguably had some autonomy and discretion within his position. Mr. Hendrickson, by contrast, exercised authority over no one. His job functions merely required him to follow the orders of the dredge engineer.[37]

In addition, under agency principles, Mr. Hendrickson's actions are not assignable to Hooks. Although a master is generally liable for the torts of his servant, liability only extends to the master if the servant is acting within the scope of his employment. *See* Restatement (Second) of Agency § 219. "To be within the scope of employment, [the] conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." *Id.* § 229. Even prohibited conduct, conduct that is not authorized, is imputable to the master if it is connected to the act that the employee is required to perform. *Id.* § 230 cmts. B & C. Thus, when the employee's conduct is not connected with his job function, the conduct falls outside the scope of his employment. *Id.* § 230 cmt. C.

Here, Mr. Hendrickson's actions during the alleged altercation were in no way connected to his job functions. The incident occurred during a down time, when neither Mr. Hendrickson nor Mr. Johnson was working. The altercation between Mr. Johnson and Mr. Hendrickson did not stem from their job activity, and it was in no way connected in any way to their job activity, that is, assisting the engineer on the dredge.[38] Instead, Mr. Hendrickson allegedly lashed out after Mr. Johnson confronted him about his language in their shared living quarters. Accordingly,

---

[37] *See* Pl.'s Opp'n, Ex. 2, Dep. of Jimmie Monceaux, 18 (explaining responsibilities of oilers on dredge) [Doc. 30-3]

[38] *See* Pl.'s Opp'n, Ex. 2, Dep. of Jimmie Monceaux, 18 [Doc. 30-3].

Hooks is not liable for Mr. Hendrickson's behavior under Title VII; thus, the EEOC is unable to prove that Hooks is liable for a purported hostile work environment.

Even attributing Mr. Hendrickson's conduct to Hooks, the EEOC's case similarly fails because the alleged conduct was not sufficiently severe or pervasive, as a matter of law. For racial harassment to be actionable as a hostile work environment, it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Meritor*, 477 U.S. at 67; *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). In this respect, "Title VII is not a general civility code for the American workplace." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Supreme Court precedent requires the alleged conduct to satisfy a subjective and objective test. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). As the Supreme Court explained,

> Conduct that is not severe or pervasive enough to create an objectively *hostile or abusive work environment – an environment* that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive *the environment* to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at 21-22 (internal citations omitted) (emphasis added). Accordingly, the victim must have subjectively perceived the environment to be abusive, and the harassment must have been such that a reasonable person would consider it severe under the totality of the circumstances. *Id.*

Determination of whether an environment is objectively offensive or abusive requires an *ad hoc* analysis, "focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Amie v.*

*City of Jennings, La.*, 2005 WL 1788068, at *1 (W.D. La. 2005) (citing *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 655 (5th Cir 2002)). However, simple teasing, offhand comments and isolated incidents (unless extremely serious) rarely will be enough to sustain a hostile work environment claim. *Faragher*, 524 U.S. at 778.

Although the EEOC acknowledges that this case provides only an isolated incident of harassment, it contends that the incident was so objectively and subjectively offensive to raise a factual issue on its prima facie case. To support this argument, the EEOC cites *Martinez v. Amity Care, L.L.C.*, No. Civ-06-1347-C, 2008 WL 111323, at *4 (W.D. Okla Jan. 8, 2008).

In *Martinez*, the district court denied the employer's motion for summary judgment, finding that a material issue of fact remained as to whether the harassment was so severe as to establish a hostile work environment claim. *Id.* There, a co-worker "used a racial slur multiple times, including in the presence of a co-worker and nursing home resident." The co-worker came in physical contact with the plaintiff and repeatedly agitated and intimidated him, even seeking him out to continue the harassment later in the workday. After reporting the incident, a supervisor admonished the plaintiff, warning him to avoid his co-worker or be sent home. But the plaintiff's job duties required interaction with that co-worker. The evidence also indicated that the plaintiff believed his co-worker would attack him, and he believed that the co-worker would have the plaintiff's supervisor (the co-worker's mother) retaliate against him; that is, the evidence indicated that the co-worker was effectively shielded by a supervisor. *Id.*

The plaintiff was so disturbed by the incident that he complained to numerous persons, even calling the employer-administrator at home several times. The court found that the case presented "the unusual situation where the events of a single day in an employment history might be deemed severe enough to have altered the terms, conditions, or privilege of the plaintiff's employment." *Id.*

The circumstances here are readily distinguishable from the facts in *Martinez*, and thus do not support the EEOC's argument that a material issue of fact remains. First, Hooks' work environment was not objectively hostile, as a matter of law. The conduct in *Martinez* occurred over an entire work-day, while the conduct here lasted a mere moment. *Id.*

Moreover, the conduct alleged here is largely episodic: there was one racial epithet and one act of physical violence all resulting from an earlier verbal confrontation unrelated to race. *Id.* This was followed by one alleged incident where a non-racial, derogatory slur *might* have been uttered. Even then, Mr. Johnson admits that he "couldn't quite make out" what Mr. Hendrickson may have said. Thus, his belief that some racial hostility continued is based purely on speculation.

Other factors further favor a finding that the environment was not objectively offensive; for instance, there is no evidence that the conduct interfered with Mr. Johnson's work performance. *See Adm'rs of Tulane Educ. Fund*, 284 F.3d at 655; *City of Jennings*, 2005 WL 1788068, at *1. Unlike the employee in *Martinez*, whose job function required continuous interaction with the harasser, Mr. Johnson was not required to continuously interact with Mr. Hendrickson. *Id.* In further contrast to the employee in *Martinez*, Mr. Johnson was never admonished to avoid Mr. Hendrickson or be sent home. *Id.* The two men largely did not interact with one another after the altercation. Likewise and in contrast to the relationship between the harassing co-worker and the plaintiff's supervisor in *Martinez*, there is no objective evidence that Mr. Hendrickson could have Hooks' management retaliate against Mr. Johnson. *Id.*

Although Mr. Johnson claims that Hooks supervisors considered him a troublemaker, that statement only occurred after Mr. Johnson insisted on Mr. Hendrickson's termination and threatened to disclose confidential material to the media. There is no way to infer that this purported insensitivity arose because of the discrimination, or that Hooks in any way condoned

Mr. Hendrickson's behavior. The evidence establishes that Hooks did not ignore the alleged racial discrimination: Mr. Johnson admits that Mr. Hendrickson was admonished by a supervisor, who told him to never to do that again. And, Mr. Johnson admits that the two men were separated after the incident. Put differently, Hooks to remedial action to ensure a safe work environment.

Although the plaintiff in *Martinez* never encountered any physical contact, while Mr. Hendrickson physically attacked Mr. Johnson, this fact alone is insufficient to create an objectively hostile work environment. *See Harris*, 510 U.S. at 22 (holding that whether an environment is sufficiently hostile or abusive requires consideration of all the circumstances, not just one). While physical contact will generally support a hostile work environment claim, as it constitute one of the most severe forms of harassment, *cf. Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) ("[D]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment"), because the alleged discriminatory conduct was so limited, this isolated incident does not rise to the level of objectively offensive conduct that renders the work environment hostile to a reasonable person as a matter of law. *See Mosley v. Marion Cty., Miss.*, 111 Fed. Appx. 726 (5th Cir. 2004) (finding that evidence of three incidents involving use of a racial slur was insufficient for an employee to establish a hostile work environment claim); *Long v. Eastfield College*, 88 F.3d300 (5th Cir. 1996) (single offensive comment *by supervisor* to female employee did not, by itself, support claim for hostile work environment.); *EEOC v. Noble (U.S.) Inc.*, No. 04-2419, 2006 WL 373487, at *3 (W.D.La. Feb. 16, 2006) (finding that single incident perhaps presented sufficient evidence of a hostile work environment where white employees placed a noose around the neck of an African-American co-worker, so that when the co-worker awoke he believed he was going to be lynched) (Minaldi, J).

Moreover, Mr. Johnson apparently did not view the work environment as subjectively offensive. He testified that after the incident, he agreed to a simple resolution, accepting Mr. Hendrickson's apology and moving to a different room away from Mr. Hendrickson. Nonetheless, it is obvious that Mr. Johnson felt slighted after the alleged incident. Indeed, the use of the word "nigger" is clearly evidence of racial animus. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1290 (11th Cir. 2008). Many individuals in Mr. Johnson's position would similarly feel offended, and Mr. Johnson allegedly further complained to the Captain that Mr. Hendrickson's behavior – though not racially motivated – continued, noting the single incident where Mr. Hendrickson may have muttered "mother fucker" once under his breath as they passed in the hallway; a statement that Mr. Johnson admits he could not "make out."

Yet, it is one thing for Mr. Johnson to view the conduct as offensive, and another for him to subjectively believe the conduct was so severe or pervasive that it altered the conditions of his employment. Although Mr. Johnson complained of Mr. Hendrickson's earlier conduct, he did not claim that the work environment on the dredge was so subjectively offensive as to be severe or pervasive, and this Court refuses to infer unreasonably from the evidence that he viewed it as such.

Further, Mr. Johnson has never once complained or indicated that the environment on board the dredge interfered with his job performance or altered the terms of his employment. *See Admin'rs of Tulane Educ. Fund*, 284 F.3d at 655; *City of Jennings*, 2005 WL 1788068, at *1. Instead, he only indicated his subjective belief that the conduct should alter the terms of Mr. Hendrickson's employment. Mr. Johnson largely complained that enforcement was not going to be handled properly by Hooks' supervisory employees, as he wanted Mr. Hendrickson fired. This court cannot infer from Mr. Johnson's insistence on a course of action calculated to result in the termination of a co-worker that Hooks' environment in any way altered the terms of his

employment. Accordingly, this case does not present one of those "unusual situations" where an isolated event may give rise to a hostile work environment claim. *See Martinez*, 2008 WL 111323, at *4; *see also Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) ("For harassment on the basis of race to affect a term condition or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"). Thus, the EEOC has failed to satisfy an element of its *prima facie* case for a hostile work environment.

Regardless of whether or not the conduct was sufficiently severe or pervasive, when a company, once informed of allegations of harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability. *See Jones v. Flagship Int'l*, 793 F.2d 714, 719 (5th Cir. 1986). Prompt remedial action need not actually end the harassment; rather, it must be *"reasonably calculated* to end the harassment." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004) (citations omitted) (emphasis added); *Waymire v. Harris County, Tex.*, 86 F.3d 424, 429 (5th Cir. 1987) (investigation was sufficiently prompt despite lasting three months where a supervisor reprimanded an alleged harasser on the day of the complaint and filed a preliminary report with his superior within one week); *see Skidmore v Precision Printing & Packaging*, 188 F.3d 606, 616 (5th Cir. 1999) (finding that the employer took "prompt remedial action" when a manager reprimanded the harassing co-worker by moving him to a different shift and instructing him to leave the plaintiff alone).

Once informed of the allegations, Hooks took prompt remedial action, reprimanding Mr. Hendrickson, separating the two parties, and providing Mr. Johnson with better living accommodations on the dredge. Mr. Hendrickson, moreover, was terminated days later. These actions clearly constitute prompt remedial action "reasonably calculated to end the harassment,"

as a matter of law. *See Skidmore*, 188 F.3d at 616; *Waymire*, 86 F.3d at 429. Whether or not

Hooks was justified in also taking action against Mr. Johnson is immaterial to the hostile work

environment claim and is more appropriately analyzed under the EEOC's retaliation claim. *See*

*EEOC v. Noble (U.S.) Inc.*, No. 04-2419, 2006 WL 373487, at *5 (W.D.La. Feb. 16, 2006) (J,

Minaldi).

### (3) Pretext and the Mixed-Motive Alternative

Under the modified *McDonnell Douglas* approach for allegations of retaliation and

termination based on mixed-motives, the plaintiff must first demonstrate a prima facie case of

discrimination. To establish a prima facie case, the plaintiff must prove that (1) the employee has

engaged in activity protected by Title VII; (2) the employer took adverse employment action

against him; and (3) a causal connection exists between the protected activity and the adverse

employment action. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312-13 (5th Cir. 2004).

The defendant then must come forward with a legitimate, non-discriminatory reason for

its decision to terminate the plaintiff. If the defendant meets its burden of production, "the

plaintiff must then offer sufficient evidence to create a genuine issue of material fact 'either (1)

that the defendant's reason is not true, but is instead a pretext for discrimination (pretext

alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its

conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-

motive[s] alternative).'" *Id.* (quoting *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854,

865 (M.D.N.C.2003)).

To carry this burden, the plaintiff must produce substantial evidence indicating that the

proffered legitimate nondiscriminatory reason is a pretext for discrimination or that another

motive was the plaintiff engaging in protected activity. *Laxton v. Gap Inc.*, 333 F.3d 572, 578

(5th Cir. 2003); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The

plaintiff must rebut each nondiscriminatory reason articulated (i.e., those reasons found "lurking in the record") by the employer. *Hicks*, 509 U.S. at 523; *Laxton*, 333 F.3d at 578.

A plaintiff may establish pretext and mixed-motive through either (1) evidence of disparate treatment or (2) evidence that the employer's proffered explanation is false or "unworthy of credence." *Reeves*, 530 U.S. at 143. An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Allegations of pretext are insufficient to withstand summary judgment when (1) the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination or retaliation occurred. *Laxton*, 333 F.3d at 578; *see Russell*, 235 F.3d at 223 (citing *Reeves*, 530 U.S. at 148).

A decision as to whether summary judgment is appropriate ultimately turns on "'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (quoting *Reeves*, 530 U.S. at 148-49). The ultimate inquiry is whether the evidence creates a material fact "*both* that the reason was false, *and* that [retaliation] was the real reason." *Hicks*, 509 U.S. at 515.[39]

---

[39] The Fifth Circuit has reaffirmed that this is a "substantial burden":

> To sustain a finding of impermissible discrimination, the evidence taken as a whole must create (1) a fact issue regarding whether each of the employer's stated reasons was what actually motivated it and (2) a reasonable inference that race or sex was a determinative factor in the actions of which plaintiff complains. Although the evidence necessary to support an inference of

For the purpose of establishing a prima facie case, the close temporal proximity between an employee's discharge and his protected activity serves as indirect proof of a causal connection. *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993). Consequently, the EEOC has established a prima facie case by showing that Mr. Johnson was fired within days of complaining of alleged racial harassment to Mr. Lopez.

Nevertheless, Hooks claims to have discharged Mr. Johnson because he violated Hooks' violence policy. Title VII's protection does not insulate an employee from discipline for work rule violations. *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 n. 3 (5th Cir. 1997). Accordingly, Hooks has met its burden of production, and the EEOC must now demonstrate that either Hooks' proffered reason was actually a pretext for retaliation, or that the reason offered is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected activity.

Here, the EEOC asserts that a material issue of fact remains regarding Hooks' motive for firing Mr. Johnson. However, temporal proximity, standing alone, is insufficient to establish an issue of fact as to pretext after an employer has provided a non-retaliatory reason for the adverse employment action. *See Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007). "If timing alone were enough, then any action taken against [an employee following a

---

discrimination may vary from case to case, "'if the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a jury cannot reasonably infer discriminatory intent.'"

The plaintiff cannot succeed by proving only that the defendant's proffered reason is pretextual. Rather, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."

*Bisco Inds.*, 119 F.3d at 370 (internal citations omitted) (discrimination case).

protected activity], no matter how justified, could be sustained as discriminatory." *Swanson*, 110

F.3d at 1188 n. 3; *accord Kolpakchi v. Principi*, 113 Fed. Appx. 633, 639 (5th Cir. 2004);

*Juarez-Keith v. U.S. Foodservice, Inc.*, 2005 WL 548074, at *8 (N.D.Tex. Mar. 8, 2005).

As a result, the EEOC further asserts that Mr. Johnson engaged in protected, opposition

activity during his later two meetings, those with Captain Monceaux, Mr. Boone, and Mr.

Hendrickson. For instance, the EEOC initially points to the deposition testimony of Captain

Monceaux and Mr. Boone, describing meetings they had with Mr. Johnson after he initially

complained of racial discrimination.[40]

However, the EEOC's case fails for two principal reasons. First, Mr. Johnson did not

engage in protected, opposition activity during these two meetings. Second, even assuming that

Mr. Johnson engaged in protected, opposition activity during these meetings, the evidence does

not demonstrate that Hooks' decision to terminate Mr. Johnson was motivated, in any way, by

Mr. Johnson engaging in that activity.

### a. Mr. Johnson Did Not Engage in Protected Activity

At the outset, this Court notes that Mr. Johnson did not oppose any practice made

unlawful under Title VII (i.e., opposition activity) during his meetings with Mr. Boone and

Captain Monceaux. Title VII only encompasses opposition activity that is based on "a reasonable

belief that the employer . . . engaged in unlawful employment practices." *Turner v. Baylor

Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007).

Here, Mr. Johnson did not complain of *continued* racial animus or a hostile work

environment. Nor would such a complaint be reasonable. To say the least, Mr. Johnson had one

rare and isolated contact with Mr. Hendrickson after his initial complaint, and this contact did

---

[40] Pl.'s Opp'n 16-17 [Doc. 30].

not evidence any *racial* discrimination. What is worse, Mr. Johnson speculates that animosity persisted through some admittedly unintelligible muttering by Mr. Hendrickson. Likewise, Mr. Johnson's meeting with Captain Monceaux was not related to alleged retaliation.

Rather, the summary judgment evidence demonstrates that these meetings primarily occurred because of Mr. Johnson's insistence on Mr. Hendrickson's termination. More specifically, Mr. Johnson pressed for Hooks to enforce its zero tolerance policy.[41] As a matter of law, this is not evidence that Mr. Johnson engaged in activity opposing retaliation, a hostile work environment, or continued racial discrimination. Thus, to engage in opposition activity, Mr. Johnson would have had to oppose perceived disparate treatment by Hooks. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001) (finding that a plaintiff may establish pretext through evidence of disparate treatment).

There is, however, no indication that Mr. Johnson reasonably believed that Hooks was selectively enforcing its zero tolerance policy. As the term "disparate treatment" indicates, Mr. Johnson would have to reasonably believe that Hooks provided better or different treatment to similarly-situated employees not in the protected class. *See id.* Yet, if Mr. Johnson held such a belief, it would be unreasonable as a matter of law. There was no indication that Hooks selectively enforced its zero tolerance policy, nor has the EEOC presented any evidence to actually support such a belief. *See Byers v. Dallas Morning News, Inc.*, 208 F.3d 419, 428-29 (5th Cir. 2000) (citing *Harvey v. Chevron USA, Inc.*, 961 F. Supp. 1017, 1032 (S.D. Tex. 1997)).

---

[41] *See* Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 89-92 [Doc. 30-3]. This Court does acknowledge that Mr. Johnson complained of alleged discrimination, but he did not complain of continued discrimination or a hostile work environment. While this Court will neither guess at Mr. Johnson's intentions nor speculate as to Mr. Johnson's credibility, the crux of these meetings, or this meeting, concerned Mr. Hendrickson's continued employment with Hooks. *Id.*

For instance, much of the EEOC's opposition hinges on the meaning of "zero tolerance." However, Mr. Johnson's subjective belief as to the meaning of zero-tolerance has little relevance under the law. *Harvey*, 961 F. Supp. at 1032 (holding that evidence of a subjective good faith belief of discrimination alone is insufficient). It would also have little effect on Hooks' employment practices. Whether an employer chooses to enforce its policy is of no concern under Title VII; all that is required is that employers treat employees equally. *See Upshaw v. Dallas Heart Grp.*, 961 F. Supp. 997, 1002 (N.D. Tex. 1997) ("Title VII does not protect employees from arbitrary employment practices, only their discriminatory intent."). Mr. Johnson had no objectively reasonable belief that Hooks treats its employees differently when enforcing a purported violation of a zero tolerance policy. Accordingly, Mr. Johnson did not engage in opposition activity.

More significantly, even if this Court could transform Mr. Johnson's activity into opposition activity, it is nevertheless inappropriate to find that his activity is *protected, opposition* activity. The Fifth Circuit recognizes that "[n]ot all activities taken in opposition to an employer's perceived discriminatory practices . . . remain insulated from reprisal under Title VII's shield." *Smith v. Texas Dep't of Water Res.*, 818 F.2d 363, 365-66 (5th Cir. 1987); *Jones v. Flagship Int'l*, 793 F.2d 714, 727 (5th Cir. 1986). The opposition clause "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Smith*, 818 F.2d at 366 (quoting *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981)). "Allowing an employee to invoke the protection of [Title VII's opposition provision] for conduct aimed at achieving purely ulterior objectives, or for conduct aimed at achieving even proper objectives through the use of improper means, could have an effect directly contrary to Congress' goal, by discouraging employers from hiring persons whom the Act is designed to protect." *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222 (1st Cir. 1976). Thus, some

opposition activity, even though sincere, may be inappropriate to justify Title VII liability. *See Jones*, 793 F.2d at 727.

The Fifth Circuit employs a balancing test to determine whether Title VII's protections may be denied to an employee's activities that result in adverse employment action. Courts must balance the employer's right to run his business against the rights of the employee to express his grievances and promote his own welfare. *See id.* For the employee's conduct to fall under the ambit of "protected activity," it must be "reasonable in light of the circumstances" and must not be "unjustifiably detrimental to the employer's interest." *Douglas v. DynMcDermott Petroleum Ops. Co.*, 144 F.3d 364, 373 (5th Cir. 1998); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1136, 1145 (5th Cir. Unit A 1981).

When an employee engages in protected activity in order to achieve a purely ulterior motive or uses improper means, such as violating company policy or using aggressive and overtly disruptive activities, to pursue a complaint of discrimination, and those actions interfere with the business of the employer, the employee has not engaged in protected activity. *See Hochstadt*, 545 F.2d at 224-28 (1st Cir. 1976). For example, in *Hochstadt* an employee, who worked as a scientist for a biomedical research foundation, alleged that her employer unlawfully retaliated against her for her opposition to the employer's practice of sexual discrimination. *Id.* at 227. Shortly after starting her employment, she claimed that the foundation engaged in sexual discrimination by paying females less than their male counterparts. She filed an EEOC charge and several lawsuits based on disparate pay and the adequacy of the foundation's affirmative action program, which were largely successful.

However, to support her claims, the employee tried to elicit salary information from other employees, sometimes interfering with ongoing research. She invited another scientist to compile

32

an affirmative action survey that was later reported to several members of Congress, and she generated a significant telephone bill for the foundation while investigating her complaint. *Id.*

She further created discontent in the work environment: in fact, several research assistants quit because of their difficulties with the employee. The employee also started rumors that the foundation would lose its funding because of its inadequate affirmative action program, upsetting her co-workers. In addition, after filing her suits, the employee invited a newspaper reporter to "examine her files containing confidential salary information" of other employees. *Id.* at 228. The reporter used this information to publish several articles. Eventually, the employee was discharged for these incidents, which the employer described as "demonstrat[ing] a renewal of plaintiff's disruptive and hostile manner and conduct, inimical to the Foundation, its directors and scientists." *Id.* at 229.

In finding that the employee's conduct was unprotected, the court balanced the retaliation provision's purpose of protecting employees opposing discrimination with the employer's need to select and control personnel. *Id.* at 231. After balancing these interests, the court found that the sum of the employee's "militant self-help activity," including her extreme hostility towards her co-workers and supervisors, went too far: "they damaged the basic goals and interests of the employer." *Id.* at 233.

Even well-intended opposition activity is unprotected when it places the employee's loyalty and cooperation to her supervisor in doubt. *Rosser v. Laborers' Int'l Union of North Am., Local No. 438*, 616 F.3d 221 (5th Cir. 1980). In *Rosser*, the plaintiff, a dues-posting clerk for the secretary-treasurer of the union, ran for her boss's position after she was approached by African-American union members who felt that the union was discriminating against them. *Id.* at 224. In that case, the plaintiff ran her campaign on a platform directed at opposing the alleged unlawful employment practices of the union. Eventually, the plaintiff was disqualified from the race and

33

discharged from her employment with the union after her boss won re-election. She sued for unlawful retaliation, claiming she was fired for engaging in opposition activity. *Id.*

The Fifth Circuit acknowledged that the plaintiff was fired for engaging in opposition activity; however, the court found her actions unprotected. Reasoning that the plaintiff's form of opposition activity placed her loyalty and cooperation in serious doubt and thus rendered her effectiveness as an employee diminished, the Court ruled in favor of her employer. *Id.* Because the plaintiff's activity was unprotected under Title VII as a matter of law, the court found the employee's actions provided a legitimate, non-discriminatory reason for her termination. *Id.*

Although the EEOC insists that Mr. Johnson engaged in opposition activity when he sought Mr. Hendrickson's discharge, his conduct is the type of improper conduct that is not afforded protection under the Title VII. First, Mr. Johnson used purportedly protected activity to achieve a purely ulterior objective. For example, when Mr. Johnson confronted Captain Monceaux and Mr. Boone at these later meetings, he admittedly intended to force, or at least coerce, Hooks to fire Mr. Hendrickson.[42]

But, it is axiomatic that the employee is not entitled to his choice of remedy; Title VII merely requires that employer's remedial measure be *"reasonably calculated* to end the harassment." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004) (citations omitted) (emphasis added). Thus, as a matter of law Mr. Johnson did not engage in protected activity when he insisted on Mr. Hendrickson's termination.

Second, Mr. Johnson used improper and disruptive "militant self-help activity" while engaging in opposition activity. For example, like the employee in *Hochstadt*, who threatened her superior, telling him that he should choose sides, and later demanded corrective action and

---

[42] *See* Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 91-95, Ex. 2, Dep. of Jimmie Monceaux, Ex. 3, Dep. of Jesse Boone[Doc. 30-3].

threatened litigation, here, when Mr. Johnson insisted that Mr. Hendrickson be fired, he effectively threatened Hooks, explaining that it "could lead to other issues . . ., [it could] get out beyond the company . . . . [It] could be a media nightmare."[43] 545 F.2d at 228. Although distinguishable, Mr. Johnson's statements are closely akin to blackmail. *See* Black's Law Dictionary 170 (6th ed. 1990) (defining blackmail as an "[u]nlawful demand of money or property under threat . . . to expose disgraceful effects.").

In any event, his warning was a clear violation of Hooks' employment policies, which requires employees who complain of misconduct to "keep the allegation(s), investigation, and the corrective action confidential." The Fifth Circuit has routinely held that opposition activity is unprotected under Title VII when it includes an employee's breach of confidentiality or a violation of work rules. *See Douglas*, 144 F.3d at 374-75 (finding attorney's breach of confidentiality and violation of ethical rules was unprotected under Title VII); *Jones*, 793 F.2d at 728 (holding that an attorney did not engage in Title VII protected activity by encouraging a discrimination claim against her employer and coordinating a class action lawsuit, where the court found such action to violate the attorney's duty of loyalty to her employer); *Jeffries*, 615 F.2d at 1036-37 (finding that secretary who violated company policy by copying and disseminating confidential personal records and agency documents in action opposing what she reasonably believed was discrimination on the part of her employer was unprotected under Title VII). It would likewise be inappropriate for Title VII to shield an employee's threatened breach of confidentiality. *See id.*

Furthermore, Mr. Johnson, through his actions, exhibited the type of insubordination and disruption that is not protected by Title VII. For example, while the prospect of Mr.

---

[43] Pl.'s Opp'n, Ex. 1, Dep. of Daniel Johnson, 92 [Doc. 30-3].

Hendrickson's continued employment may have seemed unpalatable to Mr. Johnson, it was not inappropriate or unlawful. *See Smith*, 818 F.2d at 366 (finding that a secretary's refusal to perform a job assigned by her superior, while unpalatable, was not immoral, dangerous, or degrading, and thus not protected activity under Title VII). And in contrast to the employee in *Hochstadt*, whose opposition activities were supported by actual evidence of discrimination by her employer, here Mr. Johnson alleged opposition activity came after Hooks had taken remedial action that effectively ended the harassment. All that remained was Mr. Johnson's belief that Mr. Hendrickson should be terminated. 545 F.2d at 228.

"An employer has a strong interest in having an opportunity to settle equal employment disputes through conference, conciliation, and persuasion. . . ." *Jones*, 793 F.2d at 726. Hooks' supervisors attempted to persuade Mr. Johnson to accept a course of action designed to allow both employees to keep their jobs. Mr. Johnson not only resisted, he responded by threatening Hooks. As the Fifth Circuit reasoned in *Rosser*, Mr. Johnson's actions placed his loyalty and cooperation in doubt and accordingly fatally diminished his effectiveness on board the dredge. 616 F.2d at 224. Hooks felt that nothing short of Mr. Hendrickson's termination would satisfy Mr. Johnson, and his actions usurped the discretion afforded these supervisors.

In addition, Mr. Johnson's insistence on termination came at a time when the dredge was understaffed, and when Captain Monceaux and Mr. Boone requested cooperation from Mr. Johnson. Like the employee in *Hochstadt*, Mr. Johnson's lack of cooperation was creating discontent on the dredge. 545 F.2d at 228. Similarly, Mr. Boone felt that Mr. Johnson was improperly broadcasting the allegations, investigation, and corrective action to the rest of the ship, also in violation of Hooks' company policy.[44]

---

[44] Def.'s Mot. for Summ. J., Dep. of Daniel Johnson, 69 [Doc 22-1]; Pl.'s Opp'n, Ex. 3, Dep. of Jesse Boone, 47 [Doc. 30-3] ("I heard everybody on the dredge talking about what was going on.

Viewed collectively, Mr. Johnson's actions were unreasonable in light of the circumstances and unjustifiably detrimental to the employer's interest. Accordingly, Mr. Johnson did not engage in protected activity during his later meetings with Hooks' supervisory personnel. Since the only remaining evidence of protected activity is Mr. Johnson's initial complaint to Mr. Lopez, the EEOC has failed to rebut Hooks' non-discriminatory reason for dismissing Mr. Johnson.

### b. Rebutting Hooks' Non-Discriminatory Reason Through Mixed-Motive and Pretext

Finally, this Court turns to the EEOC's contention that Hooks' supervisors made statements from which a reasonable person could infer that Hooks' decision to terminate Mr. Johnson was motivated in part by his purported protected activity. Citing various statements made by Hooks' supervisors, the EEOC claims that Hooks' fired Mr. Johnson based, in part, on (1) his failure to drop his racial discrimination complaint; (2) his failure to resolve the racial discrimination complaint; (3) his apparent reluctance to assist in the resolution of the complaint; and (4) Hooks' supervisory employee's opinion that Mr. Johnson was being a troublemaker by insisting on Mr. Hendrickson's termination.[45]

Even assuming that Mr. Johnson engaged in protected, opposition activity during these meetings, the summary judgment evidence, viewed in a light most favorable to the EEOC, does not raise a genuine issue of material fact for trial. The EEOC's lawsuit fails because there is nothing suspect about Hooks' reason for terminating Mr. Johnson. The evidence merely demonstrates that Captain Monceaux and Mr. Boone did not want to enforce Hooks' zero-

And I heard that Mr. Johnson wasn't happy. And everybody on the dredge was talking about it.").

[45] Pl.'s Opp'n 17 [Doc. 30].

tolerance employment policies in such a way that it would result in the termination of either or both employees. Eventually conceding to Mr. Johnson's demands, Hooks fired both men for violating the company's zero-tolerance violence policy.

The statements cited by the EEOC support, or are at least consistent with, Hooks' justification for firing Mr. Johnson. For example, Mr. Boone and Captain Monceaux indicated displeasure with Mr. Johnson's continued insistence on termination. They believed that Mr. Johnson was both uncooperative and disruptive when he demanded Mr. Hendrickson's termination. Accordingly, they requested that Mr. Johnson agree to a resolution that did not result in termination. They further warned Mr. Johnson that he too would be fired if Hooks gave into his demands and enforced its zero-tolerance policy by firing non-compliant employees.[46]

While it can be inferred from the deposition testimony that Captain Monceaux asked Mr. Johnson to drop his continued complaints about being called a racial slur,[47] the EEOC erroneously relies on this testimony to indicate that Hooks fired Mr. Johnson for his discrimination complaint. It is unreasonable to infer that Captain Monceaux's statement indicates any retaliatory motive on part of Hooks.

Viewing this isolated statement in the context in which it was made, this evidence merely demonstrates that Hooks did not want to fire Mr. Hendrickson or Mr. Johnson for violations of Hooks' violence policy. As noted above, when this statement was made, the MISSOURI H was understaffed. And, Mr. Johnson's insistence on termination would ultimately create a situation where an already short-handed dredge would lose two employees. The evidence merely indicates that Mr. Johnson was asked to drop his discrimination complaint because the only issue that

---

[46] *See generally* Pl.'s Opp'n., Exs. 2 & 3, Dep. of Jimmie Monceaux and Jesse Boone [Doc. 30-3].

[47] *See* Pl's Opp'n, Ex. 2, Dep. of Jimmie Monceaux, 62-63 [Doc. 30-3].

remained was whether Mr. Hendrickson should be terminated. *See Burns v. Blackhawk Mgmt. Corp.*, 494 F. Supp. 2d 427, 435 (S.D. Miss. 2007) (granting employer's motion for summary judgment and finding statement where employer told the employee that "she was through discussing the issue [of discrimination] and told him to drop the matter" insufficient to create an issue of material fact on employee's claim of retaliation).

Indeed, potentially realizing that Hooks would have to fire both men if they gave in to Mr. Johnson's demand, Mr. Boone and Captain Monceaux initially balked. But when Mr. Johnson continued to insist on Mr. Hendrickson's termination, he forced Captain Monceaux's hand. In other words, Captain Monceaux was interested in maintaining the status quo, that is, keeping the men separated while on the dredge. When Mr. Johnson continued to press the issue, which included his insistence on terminating Mr. Hendrickson, Captain Monceaux indicated that both men would have to be fired for violating Hooks' violence policy.[48] Put differently, he would have to enforce Hooks' policy equally. Thus, at worst, Captain Monceaux and Mr. Boone merely attempted to rectify perceived discrimination through cooperation, persuasion, and voluntary compliance. *See generally Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974); *see also Jones*, 793 F.2d at 726 ("An employer has a strong interest in having an opportunity to settle [Title VII complaints] through conference, conciliation, and persuasion . . . .").

Conspicuously missing from the EEOC's summary judgment evidence, moreover, is any reference to the deposition testimony of the employee who ultimately represented Hooks' upper-management during this process: Mr. Cseitzinger. When Captain Monceaux consulted Mr. Cseitzinger about what action to take, the two men both agreed that termination was warranted. In other words, Mr. Johnson's termination was a collective decision. And, in no way has Mr.

---

[48] Pl's Opp'n, Ex. 1, Dep. of Daniel Johnson, 94 [Doc. 30-3].

Cseitzinger indicated that his decision was motivated by Mr. Johnson's alleged protected activity. There is no way to infer from his deposition testimony that Mr. Cseitzinger was aware that Mr. Johnson raised a discrimination complaint or opposed some unlawful practice at Hooks. To find that Mr. Cseitzinger was motivated by some protected activity would naturally require at least some inference that Mr. Johnson engaged in protected activity. *See* 42 U.S.C. §§ 2000e-2. Thus, this testimony completely refutes the EEOC's contention that Mr. Johnson's termination stemmed from some unlawful, retaliatory motive.

Mr. Johnson's own deposition testimony reinforces Hooks' non-discriminatory reason. For instance, while Mr. Johnson initially explained the situation surrounding the altercation during his meeting, it was not until he essentially threatened Hooks and insisted on Mr. Hendrickson's termination that the Captain and Mr. Boone expressed their insensitivity to Mr. Johnson's situation. Indeed, Mr. Boone allegedly consoled Mr. Johnson and provided him support immediately after learning of the alleged altercation. But, his treatment of Mr. Johnson changed after Mr. Johnson threatened to disclose confidential information to the media and insisted on Mr. Hendrickson's termination. Where Mr. Boone once allegedly viewed Mr. Johnson as a "good worker," he viewed Mr. Johnson as a trouble maker during the later parts of these meetings.[49] Thus, the record reveals that it was not until Mr. Johnson demanded Mr. Hendrickson's termination and threatened to disclose confidential information that Mr. Boone expressed insensitivity towards Mr. Johnson.

Based on the summary judgment evidence, there is nothing contradictory, inconsistent, or suspect about Hooks' motive. The statements cited by the EEOC, at worst, represent the

---

[49] Although Mr. Johnson claims that he was never informed why he was fired, this Court is not aware of any precedent that would support the conclusion that such an action may render an employer's non-discriminatory termination decision suspect.

discomfort, confusion, and frustration a supervisor feels when encountering an employee who (1) insists on a specific employment action that is detrimental to the employer and (2) questions the manner in which the supervisor performs his job. The EEOC supports Hooks' motive by acknowledging that "this was the first time [Captain Monceaux and Mr. Boone] experienced an employee insisting on enforcement of [a] zero tolerance . . . policy."[50] They viewed Mr. Johnson's insistence and complaints to other dredge employees as disrupting the operations on the ship and further perpetuating inter-employee animosity. Eventually, Captain Monceaux and Mr. Boone acquiesced to Mr. Johnson's demand, enforcing Hooks' zero tolerance policy fairly and equally, as there would be no reason to fire Mr. Hendrickson to retaliate against Mr. Johnson. *See Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360-61 (5th Cir. 2004) (affirming summary judgment against African-American plaintiff where record showed white employees were also terminated). Thus, these statements do not provide sufficient evidence to indicate that Hooks' proffered reason for firing Mr. Johnson was pretextual or motivated by Mr. Johnson engaging in protected activity. *See Laxton*, 333 F.3d at 578.

Likewise, there is no reason to disbelieve Hooks' non-discriminatory reason for terminating Mr. Johnson. Hooks employees have all indicated that both employees were terminated for a violation of Hooks' violence policy. Although he now denies pushing Mr. Hendrickson, Mr. Johnson admitted to fighting with him when he filed his EEOC complaint.[51] There is no evidence that Hooks' reason for terminating Mr. Johnson is false.[52] Even injecting

---

[50] Pl.'s Opp'n 17 [Doc. 30-3].

[51] Pl.'s Opp'n, Ex. 5, Discrimination Complaint [Doc. 30-3 & 30-4].

[52] Although the EEOC questions whether Mr. Johnson was fired for a violation Hooks' violence policy, the EEOC supports this assertion with insufficient evidence. Hooks fired or threatened to fire the two men solely for a violation of Hooks' violence policy. The EEOC solely relies on a notation in Mr. Johnson's employee file, apparently written by someone who had no part in the

the EEOC's prima facie evidence, a material issue of fact does not exist. *Compare Reeves*, 530 U.S. at 144-46 (overruling grant of summary judgment where employee made a "substantial showing that the [defendant's] explanation was false," where jury could infer from false explanation that the real reason for employment action violated Title VII) *with Hicks*, 509 U.S. 502, 515 (1993) (Overruling directed verdict for plaintiff where fact finder found defendant's explanation false but did not find that termination was based on discrimination, holding that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.")

Next, the EEOC provides evidence that Hooks eventually rehired Mr. Hendrickson to support its allegations that Hooks retaliated against Mr. Johnson. This evidence, however, is without merit, as it lacks any probative force of retaliation. It merely supports Hooks' contention that both men were treated equally. Both Mr. Hendrickson and Mr. Johnson were eligible for rehire, but Hooks informed neither individual of their eligibility for rehire upon termination. That Mr. Johnson did not reapply for a position at Hooks, while Mr. Hendrickson did, does not provide any evidence that Hooks' decision to *terminate* Mr. Johnson was motivated by any racial animus or retaliation. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (rejecting an argument that was based on plaintiff's speculation as to retaliatory motive). Likewise, there is no evidence that the individuals who terminated Mr. Hendrickson had any part in the decision to rehire him.

---

decision, which indicates Mr. Johnson was fired for "problems with co-worker." *See* Pl.'s Opp'n, Ex. 6, Employment file [Doc. 30-4]. An act of violence between co-workers clearly indicates a problem with a co-worker; therefore, this evidence is consistent with Hooks' non-discriminatory reason. *See McDaniel v. EagleCare, Inc.*, Civ. Ac. No. 00-413, 2002 WL 655691, at *10-11 (S.D. Ind. 2002) (differing terms provided on employment record to justify termination were not inconsistent or contradictory, but consistent with one another). This is insufficient to raise an inference that Hooks' motivation in firing Mr. Johnson is suspect.

Ultimately, Hooks' actions reflect equal treatment, not retaliation: both employees were fired for violating one of Hooks' zero-tolerance policies; both employees were subject to rehire; and Hooks informed neither employee of their eligibility for rehire after termination. A contrary result could implicitly sanction conduct that may violate Title VII (e.g., had Hooks given in to Mr. Johnson's request and only terminated Mr. Hendrickson, Hooks could potentially open itself up to liability for treating Mr. Johnson more favorably than Mr. Hendrickson). *Cf. Ricci v. DeStefano*, 129 S. Ct. 2658 (2009) (holding that city's decision to ignore test results that white employees had disproportionately passed, on account of the city's concern over the test's adverse impact on a protected minority class, violated Title VII). Accordingly, it is

ORDERED that Hooks' Motion for Summary Judgment is GRANTED;

IT IS FURTHER ORDERED that the EEOC's lawsuit is dismissed with prejudice.

Lake Charles, Louisiana, this _1C_ day of _May_ 2011.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE